*Attorney Grievance Commission of Maryland v. Asher Newton Weinberg*, AG No. 1, September Term 2022. Opinion by Eaves, J.

**ATTORNEY DISCIPLINE – SANCTION – INDEFINITE SUSPENSION**

The Supreme Court of Maryland found that, in his representation of a client in a criminal matter, Respondent: (1) made false statements in pleadings with the court, regarding the victim's ability to identify the client as the perpetrator of crimes against the victim; (2) knowingly and recklessly made false statements that impugned the integrity of various judges who conducted proceedings in the criminal case against his client; and (3) in committing the aforementioned acts, committed misconduct that had the potential to bring the legal system into disrepute.

The Supreme Court concluded that Respondent violated the following Maryland Attorneys' Rules of Professional Conduct: 3.3 (Candor Toward the Tribunal), 8.2 (Judicial and Legal Officials), and 8.4 (Misconduct).

The Supreme Court concluded that the appropriate sanction is an indefinite suspension with the right to apply for reinstatement after six months from the beginning of the period of suspension.

Circuit Court for Montgomery County
Case No. C-15-CV-22-001132
Argued: May 5, 2023

IN THE SUPREME COURT

OF MARYLAND*

AG No. 1

September Term, 2022

_____

ATTORNEY GRIEVANCE COMMISSION OF
MARYLAND

v.

ASHER NEWTON WEINBERG

_____

Fader, C.J.,
Watts,
Hotten,
Booth,
Biran,
Gould,
Eaves,

JJ.

_____

Opinion by Eaves, J.

_____

Filed: August 31, 2023

Pursuant to the Maryland Uniform Electronic Legal Materials Act (§§ 10-1601 et seq. of the State Government Article) this document is authentic.



Gregory Hilton, Clerk

\* At the November 8, 2022, general election, the voters of Maryland ratified a constitutional amendment changing the name of the Court of Appeals to the Supreme Court of Maryland. The name change took effect on December 14, 2022.

On March 14, 2022, the Attorney Grievance Commission of Maryland (the "Commission"), acting through Bar Counsel, filed a Petition for Disciplinary or Remedial Action (the "Petition") against Respondent, Asher N. Weinberg, a member of the Maryland Bar, arising out of his representation of Megan B. Lemons and Bar Counsel's subsequent investigation. The Commission alleged that Respondent violated the following Maryland Attorneys' Rules of Professional Conduct ("MARPC")[1]:

- 19-301.1 Competence (1.1);
- 19-301.2 Scope of Representation and Allocation of Authority between Client and Attorney (1.2);
- 19-301.16 Declining or Terminating Representation (1.16);
- 19-303.3 Candor Toward the Tribunal (3.3);
- 19-303.4 Fairness to Opposing Party and Attorney (3.4);
- 19-308.2 Judicial and Legal Officials (8.2); and
- 19-308.4 Misconduct (8.4).

Pursuant to Maryland Rule 19-722(a), this Court referred the matter to the Circuit Court for Montgomery County and designated the Honorable Kathleen M. Dumais (the "hearing judge") to conduct an evidentiary hearing and make findings of fact and conclusions of law. After a two-day hearing held on December 12 and 13, 2022, the hearing judge found clear and convincing evidence that Respondent violated Rules 1.1; 1.2(d); 3.3(a)(1); 8.2(a); and 8.4(a), (c), and (d), as alleged by the Commission.[2] The

---

[1] Effective July 1, 2016, the Maryland Lawyers' Rules of Professional Conduct, which employed the numbering format of the American Bar Association Model Rules, were renamed the MARPC and recodified without substantive modification in Title 19, Chapter 300 of the Maryland Rules. For ease of reference and comparison with our prior opinions and those of other courts, we will refer to the MARPC using the numbering of the model rules, as permitted by Rule 19-300.1(22).

[2] Prior to the hearing, Bar Counsel withdrew the allegations that Respondent violated Rules 1.16(a)(1), 3.4(c), and 8.4(b).

hearing judge also found four aggravating factors and four mitigating factors. Bar Counsel recommends that Respondent be indefinitely suspended from the practice of law with a right to apply for reinstatement in one year. Respondent has filed exceptions to the hearing judge's Findings of Facts and Conclusions of Law. For the reasons discussed below, we shall sustain Respondent's exceptions to Rules 1.1 and 1.2, overrule Respondent's exceptions to Rules 3.3, 8.2, and 8.4, and indefinitely suspend Respondent with the right to apply for reinstatement after six months from the beginning of the period of suspension.

# I
## HEARING JUDGE'S FINDINGS OF FACT

The hearing judge found that Respondent was admitted to the Bar of the Supreme Court of Washington in 2003 and, in his first year as a lawyer, he was a full-time volunteer and operated several legal clinics in Tacoma, Washington. He then worked as a public defender in Yakima County, Washington, for approximately five years. After that, Respondent worked for the Confederated Tribes and Bands of the Yakama Nation "representing tribal members and focusing mostly on criminal law." On July 30, 2013, Respondent was admitted to the Maryland Bar. The hearing judge found that, over the course of Respondent's career in Washington and in Maryland, he has handled "hundreds and hundreds" of criminal cases.

## A.    *Representation of Megan B. Lemons*

On November 15, 2019, Megan B. Lemons was charged with armed robbery and related offenses that occurred at a 7-Eleven in Anne Arundel County on October 15, 2019. Important to the State's case against Ms. Lemons was the identification of the alleged

2

robber by Kaija Hirsch, a cashier at the 7-Eleven. At the time of the robbery, Ms. Hirsch was behind the check-out counter when an unknown woman approached her, asking to buy an item located behind the counter. As Ms. Hirsch turned to retrieve the item, the woman knocked Ms. Hirsch to the ground. Once Ms. Hirsch was on the ground, the woman jumped over the counter and held a knife to Ms. Hirsch's throat. The woman proceeded to take money out of the cash register before fleeing on foot. Shortly thereafter, the police questioned Ms. Hirsch about the identity of the robber. Ms. Hirsch described the robber as a "White female with olive toned skin[,]" and a wide build, standing somewhere between 5' 7" to 5' 8" tall. Additionally, the police posted a still photo taken from the 7-Eleven's security camera online, asking the public to help identify the suspect.

Eventually, a police investigation led to Ms. Lemons being identified as the purported robber. She was arrested in Virginia and extradited to Maryland. On January 27, 2020, a bond review hearing was held in the District Court of Maryland for Anne Arundel County before the Honorable Danielle M. Mosley. Judge Mosley ordered that Ms. Lemons be held without bond and imposed several special conditions, including the condition that Ms. Lemons not contact or harass Ms. Hirsch. One month later, a grand jury sitting in Anne Arundel County indicted Ms. Lemons and her case was transferred to the Circuit Court for Anne Arundel County. The transfer order included Ms. Lemons' regular bond conditions and the special condition that she have no contact with Ms. Hirsch.

After the case was transferred to the circuit court, Respondent entered his appearance on February 23, 2020, on behalf of Ms. Lemons. A few days after doing so, he filed a Motion to Review and Reduce Bond. The circuit court held a hearing on March

3

6, 2020, at which the Honorable Robert J. Thompson ordered that Ms. Lemons be released on home detention with the condition that she be allowed to travel for "legal, medical, and home detention appointments only." During the disciplinary hearing, Respondent claimed that because Judge Thompson did not include the special condition that Ms. Lemons have no contact with Ms. Hirsch in the home detention order, it was Respondent's understanding that "[Judge Thompson] was striking" the no-contact order. The hearing judge found, however, that Judge Thompson did not alter or strike the no-contact order imposed upon Ms. Lemons by Judge Mosley.

Throughout Respondent's preparation of Ms. Lemons' case for trial, he consistently asserted that the police wrongly identified Ms. Lemons as the robber and that she, therefore, was innocent. In an email to Glen Neubauer, the Assistant State's Attorney assigned to the matter, Respondent stated, in pertinent part:

> I have left another message for the detective, even though he has yet to ever return one of my calls. I want him to come down to the hospital, or I will drive Megan there to meet him. Someone from your side should actually meet her in person, and compare her to the person in the video.
>
> If he won't meet us, i will contact the [Ms. Hirsch], and ask her to meet us, and see if she recognizes Megan. If you have another idea, let me know.
>
> *    *    *
>
> Brian,[3] feel free to contact me by phone or e-mail.
>
> I will continue to try to get a hold of the detective.

---

[3] "Brian," who was copied on the email to Mr. Neubauer, is Brian Marsh, a Deputy State's Attorney and Mr. Neubauer's supervisor in the State's Attorney's Office for Anne Arundel County.

(All sic in original).

Mr. Neubauer did not respond to the email, so Respondent reached out to Ms. Hirsch directly and sent her the following text message:

> Ms. Hirsch. My name is Asher Weinberg. I am investigating the 7-11 robbery where you were the victim. If you are available to talk, please call or text me. Or, if you have an email address, I would like to send you some photos, and see if you recognize the person as the robber. I would also like to find out more information about the height of the woman in relationship to you.
>
> Thank you.

Ms. Hirsch responded to the text message, and, in the following week, the two began communicating about the robbery via text messages and phone calls. During one of the text-message exchanges, Respondent sent Ms. Hirsch several photographs of different women and asked whether she could identify any of the women as the robber. Ms. Hirsch told Respondent that she could not give him a definitive answer. Eventually, Respondent set up an in-person meeting between Ms. Hirsch and Ms. Lemons, and he sent the following text message to Ms. Hirsch:

> Megan can no longer afford to be on the ankle bracelet, which means she may need to turn herself back into jail on Monday. If you could meet with us tomorrow or Friday, that would be very helpful! I can drive her down to wherever you want, at anytime you want. I hate to be pushy but with Covid, the courts are not having any trials until probably November or December, and if she id truly innocent, I don't want her sitting in jail until then.
>
> Thank you.

(All sic in original). In response, Ms. Hirsch agreed to meet with Ms. Lemons.

On June 5, 2020, Respondent personally transported Ms. Lemons to an agreed-upon location. In total, the meeting lasted 15 minutes, and Respondent, Ms. Lemons, Ms.

5

Hirsch, and a friend of Ms. Hirsch were present. During that time, Respondent questioned Ms. Hirsch about the description of the robbery suspect. Although Ms. Hirsch observed that the robber was closer to the height of the Respondent than to Ms. Lemons' height, Ms. Hirsch still definitively could not rule out Ms. Lemons as the suspect. At his disciplinary hearing, Respondent testified that, although he did not specifically ask Ms. Hirsch that question, Ms. Hirsch did not tell him that Ms. Lemons was not the robber.

Two days after the meeting, Respondent texted Ms. Hirsch the following: "Good evening. I am filing a motion tomorrow to try and get [Ms. Lemons] release. May I say that when we meet, you could not identify her as your attacker? Would that be accurate?" (All sic in original). Ms. Hirsch did not respond to this text message. Respondent then called Ms. Hirsch, but she was unable to give a definitive answer as to whether she could identify Ms. Lemons as the robber. Ms. Hirsch was, however, able to say that she perceived the robber to be taller and heavier than Ms. Lemons.

The hearing judge found that,

> based on [Ms. Hirsch's] testimony and the copies of the written communications, at no point did Ms. Hirsch tell Respondent that Ms. Lemons was not the individual who committed the robbery or give him consent to make that representation on her behalf. In accepting Ms. Hirsch's testimony in its entirety, the Court finds that during her verbal and written exchanges with the Respondent, she never gave the Respondent a definitive answer as to whether Ms. Lemons was the individual who committed the robbery. Ms. Hirsch testified consistently that, at the time of the robbery, she perceived the robber to be taller and heavier because of the terror she felt being robbed at knifepoint. The Court credits Ms. Hirsch's testimony that she was never certain about the robber's identity and never made any affirmative statements to the Respondent regarding whether Ms. Lemons was or was not the individual who committed the robbery.

**B.      *Respondent Files Various Motions with the Circuit Court for Anne Arundel County***

Continuing to believe that Ms. Lemons was misidentified as the robber, Respondent filed with the circuit court a "REQUEST FOR HEARING IN JUNE BEFORE DEFENDANT BECOMES HOMELESS AND IS LIVING ON THE STREET IN ORDER TO DETERMINE WHETHER PROBABLE CAUSE STILL EXISTS TO HOLD MS. LEMONS" (the "Motion" or "June 18 Motion"). In the Motion, Respondent argued that the State did not have probable cause to continue its detention of Ms. Lemons. In support of his proposition, Respondent represented to the court that Ms. Hirsch "will testify that after seeing [Ms. Lemons] in person, she is 100% positive that [Ms. Lemons] was NOT the robber." At the disciplinary hearing, however, Respondent admitted that Ms. Hirsch never made that statement and "never conveyed to him that she would testify that Ms. Lemons was not the robber." Thus, the hearing judge found that Respondent knowingly and intentionally misrepresented that Ms. Hirsch would testify with 100% certainty that "Ms. Lemons was NOT the robber."

Shortly after filing the Motion, Respondent filed a Petition for Writ of Habeas Corpus[4] ("Habeas Petition"), asking for Ms. Lemons' release. In the Habeas Petition, Respondent claimed the following:

> 7. Defense Counsel arranged for Ms. Lemons and the victim of the robbery to meet. After meeting with Ms. Lemons, the victim spoke to Counsel by phone and stated with absolute certainty, Ms. Lemons was not the robber. She is prepared to testify to this.

---

[4] Respondent filed the Petition for Writ of Habeas Corpus in a civil case that was assigned Case No. C-02-CV-20-1400.

14. The victim of the robbery, Kaija Hirsch will testify that Ms. Lemons was not the robber.

Because receipt of the Habeas Petition was the first time that the State became aware that Respondent had arranged for Ms. Lemons and Ms. Hirsch to meet, the State filed in response a request for the circuit court to inquire about the meeting. The court held a hearing before the Honorable Mark W. Crooks, in which the parties addressed the June 5, 2020, meeting between Respondent, Ms. Lemons, and Ms. Hirsch. Judge Crooks expressed concerns about the meeting and the potential evidentiary issues that it may have created:

> [T]his Court finds that the original order controlled throughout the order that was put in place, which was a no contact order provision, and not withstanding Judge Thompson – presumably, it might have had to do with Covid, I don't know, but had some habeas or bond review, and concluded that there were limited exceptions to the no bond house arrest to meet with counsel, and medical appointments, and that kind of thing.
>
> And this Court interprets that as being an umbrella that would have forced all of the ability – even that alone would have forced all the ability for the victim to meet with the Defendant, which in no case is appropriate.

(Alteration in original).

During the disciplinary hearing, Respondent acknowledged that he arranged the meeting and transported Ms. Lemons to the meeting location. Respondent testified that, while making the arrangements for, and during, the meeting, he was operating under the assumption that the order for home detention superseded the initial order, as well as the restrictions imposed on Ms. Lemons, including the no-contact order. At the hearing, Respondent alternatively claimed that he was unaware of the no-contact order until the

hearing before Judge Crooks, stating that, "I don't believe I had that knowledge [of the no-contact order] at that – when I brought [Ms. Lemons] to meet with Ms. Hirsch, I don't believe I was aware that there was any kind of no-contact order in place." The hearing judge did not find Respondent's testimony credible and found that, "as of June 3, 2020, . . . Respondent knew or should have known the no-contact order was in place[]" and that he "assisted Ms. Lemons in violating the order."

The hearing judge further stated,

> [i]n addition to his inconsistent statements and evolving explanations, the Court has considered the Respondent's extensive experience representing criminal defendants, and that it is standard for a court to issue a no contact provision between a victim and defendant in a criminal case. The Respondent had access to Ms. Lemons' entire court file through the Maryland Electronic Court ("MDEC") e-filing system, and, knowing of Ms. Lemons' bond status and conditions, filed a Motion to Reduce Bond on February 27, 2020.

Following the hearing with Judge Crooks, the State filed on October 6, 2020, a motion in limine, arguing that Respondent's presence at the meeting between Ms. Lemons and Ms. Hirsch made him a potential trial witness and that the court should "preclude [the defense's] use of anything obtained at, or as a result of, the meeting [the Respondent] set up between [Ms. Lemons] and the victim, Kaija Hirsch." (Second alteration in original). The Honorable Pamela K. Alban heard arguments on the State's motion. Over Respondent's objection, Judge Alban found that Respondent's conduct violated the court's no-contact order and that he made himself a potential witness for the State. Judge Alban stated the following:

> You committed – potentially committed a crime here by the initial interview with the victim and so based on that, and as I look at the interactions, the

9

> results, I don't need to rehash all of it again for you but the problem becomes that the effects of what occurs after your meetings, I think opens the door and allows Ms. (sic) Neubauer more latitude in cross examination and potential witness calling.

Thus, Judge Alban struck the Respondent's appearance and directed the parties to then-County Administrative Judge, the Honorable Laura S. Ripken,[5] for a hearing to postpone the trial. Judge Alban advised that, before Judge Ripken, Ms. Lemons could have the matter postponed or elect to proceed without counsel. Ms. Lemons opted to have her trial postponed to December 17, 2020, and a bond hearing was set for October 16, 2020.

At the October 16 bond hearing, Ms. Lemons was represented by Maria E. Mena. The parties appeared before Judge Ripken to review Ms. Lemons' home detention status. Although he was no longer Ms. Lemons' attorney of record, Respondent appeared in the courtroom's gallery and attempted to address the court on behalf of Ms. Lemons. Judge Ripken denied his request to be heard and reminded him that his appearance had been stricken. At the conclusion of the hearing, Judge Ripken revoked the bond for Ms. Lemons and scheduled a further bond hearing to allow Ms. Lemons time to find another home monitoring company that she could afford and that would be acceptable to the court.

The subsequent bond hearing was held before the Honorable Richard R. Trunnell on October 19, 2020. Present at the hearing was Ms. Lemons, Ms. Mena, and the Respondent, who again was seated in the gallery of the courtroom. At the conclusion of the hearing, Judge Trunnell ruled that Ms. Lemons could be released from the Anne Arundel Detention Center to a private house arrest program to which she had been

---

[5] Judge Ripken has since been elevated to the Appellate Court of Maryland.

10

accepted. Judge Trunnell directed the attorneys of record, Mr. Neubauer and Ms. Mena, to submit an order that comported with his ruling for his signature. Following the hearing, however, Respondent used his personal email to send a proposed order for Ms. Lemons' home detention monitoring to Judge Trunnell's chambers. In response to that email, Judge Trunnell's chambers sent Respondent a letter advising him not to contact his chambers regarding Ms. Lemons' matter unless or until his appearance had been reinstated.[6]

Although he was no longer Ms. Lemons' attorney of record, during the disciplinary hearing, Respondent told the hearing judge that he sent the proposed home detention monitoring order to Judge Trunnell's chambers because he did not have access to a laptop to file the order using MDEC. He also stated that Ms. Mena, who is not well versed in using technology,[7] dictated the order while he was typing it, and that she gave him permission to send the order on her behalf. The order, however, had the Respondent's signature block. Respondent also told the hearing judge that he had authority to send the order because Judge Alban had no authority to strike his appearance.[8]

---

[6] Respondent attempted to be reinstated as Ms. Lemons' attorney on two separate occasions. First, on October 14, 2020, Respondent filed a motion purportedly on behalf of Ms. Lemons, requesting that the court order "Attorney Asher Weinberg be recognized as Attorney for Defendant in this matter[.]" The court did not rule on the motion. Second, on October 22, 2020, Ms. Mena filed a motion requesting that the court reinstate Respondent as attorney for Ms. Lemons. The court denied the motion.

[7] At the disciplinary hearing, Respondent testified that "Ms. Mena, she's essentially computer illiterate. I do a lot of her IT stuff. I'll write emails for her [and] I'll write some motions for her."

[8] Although the hearing judge found that, during the disciplinary hearing, Respondent repeatedly challenged Judge Alban's authority to strike his appearance, that "question

11

*C.*     ***Respondent Speaks to Ms. Hirsch After His Appearance Has Been Stricken***

Eventually, Ms. Lemons reached a plea agreement with the State and her case was scheduled for a hearing on February 5, 2021.  A few days before the plea hearing, however, Respondent sent Ms. Hirsch one last text message about Ms. Lemons:

> Thank you for your honesty with the State.  You are now guilty of victimizing an innocent woman as the real robber is.  I'm sure Glen [Neubauer] convinced you that megan was guilty, even though everyone who saw the video said it looked nothing like megan.  But glen tried to cover that up.  Megan has to take a plea to something she didn't do to stay out of jail.
>
> Thanks again.
>
> You can go to court on Friday morning and watch the "justice."  I'll bet he told you "it's for her own good.  She needs the help."  Even though you know it wasn't her, and never told him that.  If the real robber kills her next victim, don't bother feeling guilty.

(All sic in original).

Ms. Hirsch provided a copy of that text message to Mr. Neubauer, and the State filed the next day a motion requesting that the court order Respondent not to have any contact with Ms. Hirsch or any other State's witness.  As the matter of *State v. Lemons* was resolved on February 5, 2021, with Ms. Lemons entering an *Alford* plea to second-degree assault and theft from $100 to $1,500, no further hearing was held on the State's motion, and the court, therefore, did not issue a ruling.

The hearing judge credited Ms. Hirsch's testimony that Respondent's final text message "hurt" because she thought she was "doing the right thing by trying to be honest

---

[was] not before the Court."  Thus, the hearing judge did not make a finding of fact as to this particular point by Respondent.

and helping[] . . . figure out whether or not[] . . . Megan was [the robber]." The judge also found that Respondent's text was "inappropriate," "[could] be considered harassing[,]" and "show[ed] extremely poor judgment."

**D.** ***Respondent's Statements About Multiple Judges After the Conclusion of State v. Lemons***

Six months after the conclusion of *State v. Lemons*, Respondent made statements that the hearing judge found impugned the integrity of Judge Alban, the Honorable J. Michael Wachs, and the Honorable William C. Mulford II.[9] First, Respondent made repeated statements about Judge Alban during an August 6, 2021, hearing in the case of *State v. Delvon Harrod, II*.[10] Second, Respondent sent an email to the County Administrative Judge, the Honorable Glenn L. Klavans,[11] repeating the statements he made about Judge Alban during the August 6 hearing and including statements about Judges Wachs and Mulford. Third, Respondent created a flyer with statements about Judges Alban and Wachs. As to all of these matters, the hearing judge found that "Respondent does not deny making the statements or that the statements impugned the integrity of Judge Alban, Judge Wachs, and Judge Mulford. Rather, he asserts the statements were true, though he offered no proof of the statements[.]"

---

[9] Judge Mulford retired on February 14, 2022, and now sits as a Senior Judge.

[10] This matter was before the Circuit Court for Anne Arundel County, Case No. C-02-CR-18-002457.

[11] Judge Klavans retired on April 19, 2023, and now sits as a Senior Judge.

13

**1. Respondent's statements during the August 6, 2021, hearing**

On August 6, 2021, Respondent appeared before Judge Alban for a bond review hearing on behalf of the defendant in *State v. Harrod*. At the hearing, Respondent asked Judge Alban to recuse herself. In support of his request, Respondent stated the following:

> You[, Judge Alban,] are a liar, you are biased, you have demonstrated bias, you have stepped into the shoes of the State's Attorney on occasion, you refuse to apply the law when it doesn't suit your purposes or when you don't agree with it. You are complicit in kidnapping and basically you are corrupt for a judge. So I have to ask you that you recuse yourself.

(All sic in original). Judge Alban denied Respondent's request. Throughout the hearing, Respondent renewed his request for Judge Alban to recuse herself, repeating that Judge Alban was "a liar," "biased," "corrupt," "complicit in kidnapping," and improperly stepped "into the shoes of the State's Attorneys" and that, therefore, Mr. Harrod, could not get a fair hearing. Judge Alban again denied his request, and the hearing in the *Harrod* case resumed.

The hearing judge found that the Respondent's statements about Judge Alban "were not opinions and that they were made with reckless disregard as to their truth or falsity and that each of the statements impugned Judge Alban's integrity."

**2. Respondent's August 8, 2021, email correspondence with Judge Klavans**

On August 8, 2021, Respondent sent Judge Klavans an email that stated the following:

Good afternoon,

I am writing to request that a number of the Judges in your courthouse be permanently recused from any case I am named in, due to their corruption which has spread though rot in the judiciary of Anne Arundel Circuit Court.

14

Among these are:

Pam Alban. While on the bench, she has lied, acted as a State's attorney, demonstrated bias towards the state, and is complicit in kidnaping. She also refuses to apply the law when it does not suit her personal beliefs, even thought the law was very clear on the issues at hand. When I asked her to recuse herself at my hearing, on Friday, she stated that she did not see any of that in her actions. That is either another lie, or more bias.

Judge Wachs: His demonstrated bias against the Defense Bar, his hypocrisy, and his refusal to apply the law has caused permanent harm to my some of my clients.

Judge Mulford: His bias against me, his allowing, along with Pam Alban, State's attorney to lie to the Court, and commit fraud upon the Court all remove him from the ability to be fair and impartial to me or my clients.

Additionally, as part of my goal to expose the corruption within your Court, and to try and bring about a political action against them, I shall be distributing the attached flyer, or similar, in front of your courthouse on random morning and lunch times.

Please help to protect my client's constitutional rights, and what is left of the integrity of the Court in your country.

(All sic in original).

In addition to the above, Respondent also claimed that Judge Alban

allowed "[Mr. Neubauer] to lie to the Court [] and commit fraud upon the Court" as demonstrated by the Respondent's testimony that Mr. Neubauer filed a response to the Respondent's motion that did not cite case law and that, according to the Respondent, Mr. Neubauer stated that the witnesses in the *Lemons* matter all changed their positions regarding the identification of Ms. Lemons as the robber after speaking with the Respondent.

(Alterations in original).

15

Judge Klavans responded to the email in which he explained that recusal is left to the individual judge. He denied Respondent's request to permanently recuse Judges Alban, Wachs, and Mulford from hearing cases where he appeared as counsel.

### 3. Respondent's August 2021 flyer

Attached to Respondent's email to Judge Klavans was a copy of a flyer he intended to circulate outside of the courthouse. The flyer had photographs of Judges Wachs and Alban with an "X" superimposed over each of their images. Beneath each photograph were the words, "Bias, Lawless, Criminality[.]" In addition, the flyer included a link to a website named "AnneArundelCorruptCourts.com."[12] Also at the bottom of the flyer there was a tagline, "Anne Arundel Circuit Court – Where our Constitution Comes to Die[,]" and a QR code[13] that directed users to a publicly available Change.org petition[14] calling on former Maryland Governor Larry Hogan to recall Judges Wachs and Alban for "violat[ing]

---

[12] It is not discernable from the record what the content of the website was.

[13] "QR Code, in full Quick Response Code, [is] a type of bar code that consists of a printed square pattern of small black and white squares that encode data[.] QR Codes are often used in advertising to encode a URL of a Web site[.] QR Codes are usually read with . . . [the] camera on mobile telephones, which then use special software to decode the pattern[,]" allowing the user to go directly to the Web site. *Erik Gregersen*, QR Code, Britannica (April 03, 2023), https://www.britannica.com/technology/QR-Code *archived at* https://perma.cc/5Y8H-GTW9.

[14] Change.org is a website that allows individuals to create their own petitions to advance what they believe are important social causes. Change.org, https://www.change.org/about *archived at* https://perma.cc/RK6J-528U.

their oath of office."[15] (Alteration in original). Respondent disseminated the flyer to Judge Klavans and several attorneys and posted it on the listserv[16] for the Maryland Criminal Defense Attorneys' Association. After considering Respondent's testimony at the disciplinary hearing, the hearing judge found that the statements Respondent made in the email to Judge Klavans and on the flyer regarding Judges Alban and Wachs were "not opinion, and . . . [were] made . . . with reckless disregard as to [their] truth or falsity."

## II
## HEARING JUDGE'S CONCLUSIONS OF LAW

The hearing judge found by clear and convincing evidence that Respondent violated Rules 1.1; 1.2(d); 3.3(a)(1); 8.2(a); and 8.4(a), (c), and (d).

### A.    *Rules 1.1 and 1.2*

Rule 1.1 states: "An attorney shall provide competent representation to a client. Competent representation requires legal knowledge, skill, thoroughness, and preparation reasonably necessary for the representation." Meanwhile, Rule 1.2(d) states:

> An attorney shall not counsel a client to engage, or assist a client, in conduct that the attorney knows is criminal or fraudulent, but an attorney may discuss the legal consequences of any proposed course of conduct with a client and may counsel or assist a client to make a good faith effort to determine the validity, scope, meaning, or application of law.

---

[15] During Respondent's disciplinary hearing, the Change.org petition to recall Judges Alban and Wachs was available to public. Currently, however, the Change.org petition is no longer accessible.

[16] A listserv, as used by the Maryland Criminal Defense Attorney's Association, is a "[d]iscussion list" that allows online community members to "send a message to the list for distribution to all subscribers." About Discussion Lists: Building Virtual Communities, https://www.lsoft.com/products/about_discussionlists.asp *archived at* https://perma.cc/NNG4-LDMX. Recipients of a message can opt to respond to the message and engage in a back-and-forth discussion. *See id.*

17

According to the hearing judge, Respondent violated Rule 1.1 and 1.2(d) because he "knew about the no contact order . . . when he assisted his client in violating the no contact order by arranging the meeting with Ms. Hirsch, transporting Ms. Lemons to the meeting, and facilitating communication between Ms. Lemons and Ms. Hirsch on June 5, 2020."

## B.    Rule 3.3

Rule 3.3(a)(1) states that an attorney shall not knowingly "make a false statement of fact or law to a tribunal or fail to correct a false statement of material fact or law previously made to the tribunal by the attorney[.]"   The hearing judge found that Respondent violated Rule 3.3(a)(1) when he filed the June 18th Motion and the Habeas Petition.   In the Motion, the hearing judge found that Respondent knowingly and intentionally misrepresented the fact that Ms. Hirsch was "100% positive" that Ms. Lemons was not the robber; and, in the Habeas Petition, that Respondent knowingly and intentionally misrepresented that Ms. Hirsch had "stated with absolute certainty" that Ms. Lemons was not the robber.

## C.    Rule 8.2

Rule 8.2(a) states:

> An attorney shall not make a statement that the attorney knows to be false or with reckless disregard as to its truth or falsity concerning the qualifications or integrity of a judge, adjudicatory officer, or public legal officer, or of a candidate for election or appointment to judicial or legal office.

The hearing judge found that Respondent made oral and written statements that were made with reckless disregard as to their truth or falsity in violation of Rule 8.2(a) when he made statements about: (1) Judge Alban at the August 6, 2021, hearing in *State v. Harrod*, (2)

18

Judges Alban, Wachs, and Mulford in his August 8, 2021, email to Administrative Judge Klavans, and (3) Judges Alban and Wachs in the flyer attached to an email to Judge Klavans, which was also publicly disseminated and made available on a public website.

**D.     Rule 8.4**

Rule 8.4 states, in pertinent part, that it is professional misconduct for an attorney to "(a) violate or attempt to violate the Maryland Attorneys' Rules of Professional Conduct;" "(c) engage in conduct involving dishonesty, fraud, deceit or misrepresentation;" and "(d) engage in conduct that is prejudicial to the administration of justice[.]"

First, the hearing judge found that Respondent violated Rule 8.4(a) when he violated multiple rules under the MARPC. Second, she also found that Respondent violated Rule 8.4(c) by making "false statement[s] knowing that [they were] untrue." Specifically, the hearing judge concluded that the violations of Rule 3.3 constitute violations of Rule 8.4(c). Finally, the hearing judge concluded that Respondent's statements, including those made directly to Judge Alban, in the email to Judge Klavans, and in the flyer violated Rule 8.4(d). Quoting from *Attorney Grievance Commission. v. Basinger*, 441 Md. 703, 713 (2015), the hearing judge stated that Respondent's statements "were neither inartful slips of the tongue nor spoken in the heat of an oral altercation[,]" and that his conduct "br[ought] the legal profession into disrepute."

**E.     Aggravating and Mitigating Factors**

The hearing judge found four aggravating factors: (1) a pattern of misconduct; (2) multiple violations of the rules of professional conduct; (3) submission of false evidence,

19

false statements, or other deceptive practices during the attorney disciplinary process; and (4) substantial experience in the practice of law. The hearing judge also found four mitigating factors: (1) absence of a prior disciplinary record; (2) absence of a dishonest or selfish motive; (3) remorse; and (4) unlikelihood of repetition of the misconduct.

### III
### STANDARD OF REVIEW

"This Court has original jurisdiction and complete jurisdiction in attorney discipline proceedings and conducts an independent review of the record." *Att'y Grievance Comm'n v. Jackson*, 477 Md. 174, 182 (2022). We review a hearing judge's findings of fact for clear error. *See* Md. Rule 19-740(b)(1). If, however, the respondent has not filed exceptions to the hearing judge's findings of fact, this Court may accept the findings of fact as established. *See* Md. Rule 19-740(b)(2)(A). We review a hearing judge's conclusions of law without deference and determine whether clear and convincing evidence establishes that a lawyer violated the MARPC. *See* Md. Rule 19-740(b)(2); Md. Rule 19-727(c). In the matter before us, Bar Counsel has not filed any exceptions; however, pursuant to Rule 19-728(b), Respondent has filed exceptions to the hearing judge's findings and conclusions.

### IV
### EXCEPTIONS

In providing context for his exceptions, Respondent characterizes his conduct and representation of Ms. Lemons as passionate and zealous advocacy on behalf of a mistakenly identified and accused perpetrator of the crimes against Ms. Hirsch. He acknowledges that he "admittedly went too far to protest what he believed to be a

20

miscarriage of justice" and went "overboard in protesting his removal from the case of a woman considered innocent[.]" Respondent also describes his conduct as "[t]inged with hyperbole[,]" "provocative[,]" and an "exercise[ in] poor judgment [which]. . . he regrets." But he faults the hearing judge for dismissing as reckless his complaints about Ms. Lemons' treatment by the circuit court and not examining the merits of the rulings of the circuit court in Ms. Lemons' criminal case to determine whether his conduct was sanctionable. Specifically, Respondent excepts to the hearing judge's findings of fact and conclusions of law which we have summarized as follows:

1. Respondent argues that the hearing judge refused to examine the circuit court's judicial rulings concerning his removal as Ms. Lemons' attorney. Among those rulings, Respondent believes the hearing judge was required to consider whether: (1) the circuit court improperly required him to provide competent evidence to support the allegations he made; and (2) the circuit court was required to hold an evidentiary hearing before striking his appearance as Ms. Lemons' attorney.[17] In addition, Respondent argues that the hearing judge failed to require Bar Counsel to produce clear and convincing evidence that Respondent's statements were uttered with actual knowledge of their falsity or that they recklessly disregarded the truth. He urges us to find that, in accordance with *New York Times v. Sullivan*, 376 U.S. 254 (1964), Bar Counsel had the burden to show "actual malice" with respect to the statements he made, and that Bar Counsel failed to do so.[18]

2. The hearing judge had no basis to find that Respondent violated the no contact order because that restriction was only in a commitment order that was vacated when Judge Thompson signed a Release from Commitment and

---

[17] In his Supplemental Memorandum, Respondent provides an additional exception that, in summary, contends that the hearing judge presumed Respondent's statements were false, and that she shifted the burden to Respondent to prove they were true, and that she failed to examine the merits of Respondent's complaint. We address these points in the broader exception raised here.

[18] In this exception, Respondent raises two issues: (1) Ms. Lemons' Sixth Amendment right to counsel of her own choosing; and (2) his right to criticize the circuit court judges and their rulings. We will address them separately.

21

issued a home detention order that did not include the restriction. In addition, because the home detention order permitted Ms. Lemons to leave home to attend legal appointments, the meeting with Ms. Hirsch qualifies as a legal appointment.

3. The hearing judge erroneously required Respondent to prove "to [the hearing judge's] satisfaction" that he accurately recounted Ms. Hirsch's statements as to the identity of the robber in his pleadings before the circuit court and those made during his arguments to Judge Alban. Pursuant to Maryland Rule 1-311(b), when he signed his various motions to release Ms. Lemons from jail, Respondent had a good-faith basis to believe that Ms. Hirsch would testify consistently with the language in those motions. And, as he testified at his disciplinary hearing, Ms. Hirsch stated in a phone call that "it was not Meghan…[t]he robber was much bigger than her[, w]alk was different . . . . she said it wasn't her."

4. That, while he was "unceremoniously discharged," the hearing judge should not have punished him for (1) attempting to speak up for Ms. Lemons before Judge Ripken, (2) offering information to Judge Trunnell, or (3) sending the last "caustic text" to Ms. Hirsch. Respondent contends that he is being punished for going "above and beyond to fight for a client divested of fundamental rights."

With respect to the exceptions, we conclude that Respondent's exceptions as to Rules 3.3(a)(1), 8.2(a), and 8.4(d) have no merit and we shall overrule them. Respondent's exceptions as to Rules 1.1 and 1.2(d), however, are well-taken, and we shall sustain them. We explain our reasons below.

# V
# ANALYSIS

It is helpful to bifurcate Respondent's exceptions into those that encompass more general allegations versus those that directly challenge specific findings or conclusions made by the hearing judge. Thus, we proceed accordingly.

22

*A.*     *General Exceptions*

### 1. The Hearing Judge had No Obligation to Review the Circuit Court's Rulings as to Ms. Lemons' Sixth Amendment Right to Counsel of her Choice

Respondent spent a significant portion of his exceptions arguing that Judge Alban's removal of him as Ms. Lemons' attorney violated Ms. Lemons' Sixth Amendment right to counsel of her choice. Citing *State v. Goldsberry*, 419 Md. 100 (2011), Respondent argues that the hearing judge should have found that Judge Alban "lacked any legally-sufficient basis for overriding a defendant's Sixth Amendment right to choose her own counsel." In *Goldsberry*, we stated that the presumption in favor of the right to counsel of one's own choosing may be overcome "not only by a demonstration of actual conflict but by a showing of a serious potential for conflict." 419 Md. at 118 (quoting *Wheat v. United States*, 486 U.S. 153, 164 (1988)). Here, however, Judge Alban's ruling to strike Respondent's appearance as Ms. Lemons' attorney was not subject to review by the hearing judge. That process is covered under our rules governing appeals in criminal cases.[19] Rather, the hearing judge's responsibility was to determine whether Respondent's conduct violated the MARPC by clear and convincing evidence.[20]

---

[19] *See* Md. Rule 4-408 ("An application for leave to the Appellate Court shall be governed by Rule 8-204"); *see also* Md. Rule 8-204(b)(2)(A) (generally an "application [for leave to appeal] shall be filed within 30 days after entry of the judgment from which the appeal is sought.").

[20] The role of the hearing judge in an attorney disciplinary matter is to help determine "a lawyer's fitness to practice law[.]" *Att'y Grievance Comm'n v. Green*, 278

Respondent suggests that the hearing judge still was required to review Judge Alban's ruling to determine whether Respondent's criticisms of that ruling and Judge Alban were warranted. If Respondent's criticisms were factual commentary on Judge Alban's ruling, or if he had simply criticized her for getting the law wrong, we would agree. However, Respondent (1) called Judge Alban a liar, (2) accused her of being biased and acting as the prosecutor, (3) accused her of "refus[ing] to apply the law when it doesn't suit [her] purpose or when [she does not] agree with it; (4) said she was "complicit in kidnapping," and (5) accused her of being corrupt. Whether those accusations qualify as misconduct does not turn in any way on the correctness of Judge Alban's ruling. Because the hearing judge properly declined to review the legality of the circuit court's decision to strike Respondent's appearance, we find no error. Thus, we overrule this exception.

**2. Respondent is not being Punished for Zealously Representing Ms. Lemons**

Respondent argues that, despite "much evidence that [Ms. Lemons] was completely innocent," her Sixth Amendment rights were "trampled on" by Judge Alban, and because he hoped that Ms. Hirsch would exonerate his client, this Court should not punish him for his conduct in going "above and beyond to fight [to prevent Ms. Lemons from being] divested of fundamental rights." This Court, therefore, should find that "the vigorous defense he provided is worthy of commendation, not condemnation." We do not agree that Respondent is being punished for zealously representing Ms. Lemons.

---

Md. 412, 414–15 (1976); *see also* Md. Rule 19-300.1 (observing that the MARPC define an "attorney's professional role[]" not the rights of their client(s)).

In his exceptions, Respondent raised this issue with respect to his last email to Ms. Hirsch in which he blamed her for Ms. Lemons' pleading guilty. He also notes that "he exercised poor judgment in a brief but caustic text." Although Respondent initially was charged with an ethical violation arising from sending the text to Ms. Hirsch pursuant to Rule 3.4,[21] Petitioner voluntarily dismissed that allegation. And nothing in the record reflects that the hearing judge found a violation of Rule 3.4 based on Respondent harassing Ms. Hirsch.

Here, our holdings in this matter with respect to violations of the MARPC with which Respondent has been charged also do not concern any alleged harassment of Ms. Hirsch by Respondent pursuant to Rule 3.4 or any other MARPC. Therefore, Respondent has not shown by a preponderance of the evidence that he is being punished for zealously representing Ms. Lemons, and we overrule this general exception.

**B.**  ***Specific Exceptions***

### 1. Rules 1.1 and 1.2(d): Respondent did not Violate the No-Contact Order when he Arranged the Meeting between Ms. Lemons and Ms. Hirsch

An attorney violates Rule 1.1 if they "fail[] to comply with court orders." *Att'y Grievance Comm'n v. Parris*, 482 Md. 574, 592 (2023). An attorney also violates Rule 1.2(d) if they "assist the client in breaking the law." *Att'y Grievance Comm'n v. Culver*, 381 Md. 241, 275 (2004). In this case, the hearing judge found that Respondent simultaneously violated Rules 1.1 and 1.2(d) when he arranged the meeting between Ms.

---

[21] Pursuant to Rule 3.4(c), an attorney shall not "knowingly disobey an obligation under the rules of a tribunal except for an open refusal based on an assertion that no valid obligation exists."

25

Lemons and Ms. Hirsch in violation of the no-contact order believed to be in effect at the time of the meeting on June 5, 2020. We do not agree with the hearing judge that there was clear and convincing evidence that the no-contact order was still in effect, and we will sustain Respondent's exceptions that he violated these two rules. Below, we provide some context as to the timeline of events that perhaps created some of the confusion about the status of the no-contact order.

Respondent offers several reasons in support of his exception that he did not violate the no-contact order and that he also did not assist Ms. Lemons in doing so. First, he claims that he was not aware of the order entered by Judge Mosley in the District Court on January 27, 2020, because he did not enter his appearance until February 23, 2020, after the case had been transferred to the circuit court. Specifically, Respondent testified during his disciplinary hearing that he had no way of knowing that Judge Mosley's no-contact order existed prior to him entering his appearance in the matter because he "lacked familiarity" with the MDEC system[22] and, thus, should be forgiven for not researching the order prior to his appearance. We do not give this justification any weight for two reasons. Attorneys have been required to use MDEC for cases filed in Anne Arundel County since 2014,[23] so

---

[22] MDEC is the electronic case management processing and record-keeping system used in the State of Maryland's court system. Through MDEC, state courts "collect, store and process records electronically, and will be able to access complete records instantly as cases travel from District Court to Circuit Court[.]" In essence, MDEC allows for paper records to be available online and on-demand. https://mdcourts.gov/mdec/about *archived at* https://perma.cc/RN8D-EJ5Q.

[23] "MDEC launched in October 2014 in Anne Arundel County[.]" MDEC Updates/Alerts, https://mdcourts.gov/mdec/latestupdatesarchive#mdec20170612 *archived at* https://perma.cc/6S82-D3Z4.

this purported lack of familiarity with the system is confounding and not persuasive.[24]

Also, at the time Respondent entered his appearance in the circuit court after Ms. Lemons was indicted on February 21, 2020, Judge Mosley's order carried over to the circuit court in accordance with Maryland Rule 4-216.3(a).[25] Thus, we agree with the hearing judge that Respondent should have been aware of Judge Mosley's order because it was in the circuit court file when he entered his appearance, and a review of the file reflected the no-contact prohibition on the order.

Second, Respondent argues that he did not pay attention to the February 27, 2020, circuit court Commitment because it was not signed by a judge, but by the Clerk of the Court. He conveniently disregards, however, the fact that Judge Mosley's order was still in effect, having carried over from the District Court.

Third, Respondent excepts because he contends that Judge Thompson's order superseded the prior orders that contained the no-contact provision. He points out that, on March 6, 2020, Judge Thompson reviewed Ms. Lemons' bail status and issued an order that superseded Judge Mosley's order—the Order for Home Detention, which released Ms. Lemons from confinement in the detention center. Although the hearing judge found that Judge Thompson did not "alter or strike" the no-contact order, we disagree with this

---

[24] *See* Comment 6 to MARPC 1.1 ("To maintain the requisite knowledge and skill, an attorney should keep abreast of changes in the law *and its practice*, engage in continuing study and education and comply with all continuing legal education requirements to which the attorney is subject." (Emphasis added)).

[25] "When conditions of pretrial release have been previously imposed in the District Court, the conditions continue in the circuit court unless amended or revoked pursuant to section (b) of this Rule." Md. Rule 4-216.3(a).

finding. Here, it was not unreasonable for Respondent to conclude that the March home detention order superseded both the circuit court Commitment dated February 27, 2020, as well as Judge Mosley's order. The home detention order did not expressly incorporate by reference any prior orders or terms; it purports to stand on its own, and it does not include the no-contact prohibition. Moreover, certain terms of the two orders were clearly in conflict, as Judge Mosley's order required that Ms. Lemons be held without bond, and Judge Thompson ordered that she be released on home detention. As a result, it was not unreasonable for Respondent to conclude that, as of March 6, 2020, the no-contact order was no longer in force.[26] When Respondent and Ms. Lemons met with Ms. Hirsch on June 5, 2020, it was not unreasonable for him to believe that Judge Mosley's order was no longer in effect because the no-contact order was not reinstated until the hearing before Judge Crooks on July 28, 2020.

Thus, although it was inadvisable for Respondent to arrange the meeting between Ms. Lemons, the charged suspect, and Ms. Hirsch, the victim, this conduct is not clear and convincing evidence of a violation of either Rule 1.1 or Rule 1.2(d) because it was not unreasonable for Respondent to conclude that the no-contact order was not in effect at the time of the meeting. Accordingly, we sustain the Respondent's exceptions to the hearing judge's conclusions of law that Respondent violated them.

---

[26] Respondent offers an additional, untenable reason for excepting to the hearing judge's finding that he violated the no-contact order: that Judge Thompson's order for home detention permitted Ms. Lemons to leave her home for legal appointments, and a meeting with Ms. Hirsch qualifies as such. We find this reasoning to be baseless, as it strains credulity that the home detention order could be interpreted to permit Ms. Hirsch to leave home to have contact with the victim of the crimes with which she is charged.

28

## 2. Rule 3.3(a)(1): Respondent Misrepresented to the Circuit Court Ms. Hirsch's Statements as to whether she could Identify Ms. Lemons as the Robber

The hearing judge found that Respondent violated Rule 3.3(a)(1) when he filed the June 18 Motion and the Habeas Petition in the circuit court. In the Motion, the hearing judge found that Respondent knowingly and intentionally misrepresented the fact that Ms. Hirsch was "100% positive" that Ms. Lemons was not the robber; and, in the Habeas Petition, Respondent knowingly and intentionally misrepresented that Ms. Hirsch "stated with absolute certainty," that Ms. Lemons was not the robber.

In his exceptions, Respondent argues that his statements made in the Motion and Habeas Petition were not direct quotes of Ms. Hirsch. Instead, Respondent claims that those statements were merely what he perceived would be Ms. Hirsch's "anticipated testimony." Thus, according to Respondent, because he had more than substantial factual justification to proffer what he expected Ms. Hirsch to say, he did not make any false statements of fact to the court. We do not agree for the following reasons.

"As one might expect, an attorney violates Rule 3.3(a)(1) when [they] knowingly provide[] a court with false information." *Att'y Grievance Comm'n v. White*, 480 Md. 319, 378 (2022) (citations and internal quotation marks omitted). In his June 18 Motion, Respondent articulated to the circuit court that "Ms. Hirsch will testify that after seeing Ms. Lemons in person, she is 100% positive that Ms. Lemons was NOT the robber." Similarly, in the Habeas Petition, Respondent definitively stated that Ms. Hirsch, "[a]fter meeting with Ms. Lemons, . . . spoke to Counsel by phone and stated with absolute certainty, Ms. Lemons was not the robber. She is prepared to testify to this." Further, in

29

the Motion, Respondent said that "Ms. Hirsch will testify that Ms. Lemons was not the robber."

At the disciplinary hearing, however, Ms. Hirsch testified to the opposite of Respondent's representations, stating:

- She never told anyone, including Respondent, that she was 100 percent positive that Ms. Lemons was not the robber;

- She never gave Respondent a definitive answer when he asked her if she could identify Ms. Lemons;

- She never told Respondent that she was prepared to testify in court that Ms. Lemons was not the robber;

- She never gave Respondent permission to make any sort of representation on her behalf, to the court, that Ms. Lemons was not the robber; and

- She never stated to anyone, either in text or verbally, that she could say whether Ms. Lemons was or was not the robber.

As we have consistently reiterated, the hearing judge, who "is in the best position to assess first hand a witness's credibility[,]" accepted Ms. Hirsch's testimony in its entirety and credits the fact that Ms. Hirsch was never certain about the robber's identity and never made any affirmative statements to Respondent. *Att'y Grievance Comm'n v. Smith*, 442 Md. 14, 35 (2015) (quoting *Att'y Grievance Comm'n v. Sheridan*, 357 Md. 1, 17 (1999)).

Indeed, our review of the record shows that Ms. Hirsch's testimony was significantly different than the misrepresentations in the pleadings filed by Respondent. In addition, during the hearing, Respondent admitted that Ms. Hirsch never told him whether she was "100% positive" that Ms. Lemons was the robber, and that she never conveyed to him that she would testify that Ms. Lemons was not the robber. Instead, Respondent

30

admitted that his proffer to the court about Ms. Hirsch's testimony was based on "a lot of information." But most importantly, claimed Respondent, his proffer was based on Ms. Hirsch's testimony that the robber was shorter than Ms. Lemons; thus, he assumed that Ms. Hirsch would testify that Ms. Lemons is 100 percent not the robber.

As the reviewing court, we cannot say that the hearing judge's assessment of Ms. Hirsch's credibility was clearly erroneous, and we accept it in full. Accordingly, Respondent violated Rule 3.3(a)(1) when he wrote the following: "Ms. Hirsch will testify that after seeing Ms. Lemons in person, she is 100% positive that Ms. Lemons was [not] the robber[;]" "After meeting with Ms. Lemons, [Ms. Hirsch] spoke to Counsel by phone and stated with absolute certainty, Ms. Lemons was not the robber[;]" and "The victim of the robbery, Kaija Hirsch will testify that Ms. Lemons was not the robber." Respondent knew this was blatantly untrue. Thus, we overrule Respondent's exceptions to the conclusion of law that he violated Rule 3.3(a)(1).

### 3. Rule 8.2(a): Respondent Made Statements that were Knowingly False and Reckless and Impugned the Integrity of the Judges about whom the Statements were Made

Rule 8.2(a) provides:

> An attorney shall not make a statement that the attorney knows to be false or with reckless disregard as to its truth or falsity concerning the qualifications or integrity of a judge, adjudicatory officer or public legal officer, or of a candidate for election or appointment to judicial or legal office.

A violation of Rule 8.2(a) requires three things: that (1) a lawyer made a false statement; (2) the statement concerned the qualifications or integrity of a judge or a candidate for judicial office; and (3) the lawyer made the statement with knowledge that it was false or

31

with reckless disregard as to its truth or falsity. *Att'y Grievance Comm'n v. Stanalonis*, 445 Md. 129, 139 (2015). We make three observations about adjudicating alleged violations of Rule 8.2(a).

First, the purpose of the rule is to protect "the integrity of the judicial system, and the public's confidence therein[,]" not to protect judges from unkind or undeserved criticism. *Att'y Grievance Comm'n v. Frost*, 437 Md. 245, 263 (2014). With that in mind, "certain phrases, alone, may not necessarily rise to the level of an attack on a judicial officer or public legal officer sufficient to warrant action[.]" *Id.* at 262. But when "used in conjunction with false factual allegations of corrupt activity . . . [it] is clearly in violation of Rule 8.2(a)." *Id.*

Second, to ensure that enforcement of Rule 8.2(a) does not infringe on core speech rights, a high standard is embedded within that rule, which encompasses only speech that is false and made with knowledge of its falsity or with reckless disregard as to its truth or falsity. As we observed in *Attorney Grievance Commission v. Stanalonis*, "[i]n the First Amendment context, 'reckless disregard for truth or falsity' evokes the subjective test for civil liability for defamation of a public figure set forth [in] *New York Times Co. v. Sullivan*, 376 U.S. 254 (1964)." 445 Md. at 143 (parallel citations omitted). Under that test, "reckless disregard" demands more than just a conclusion that a reasonable person would have refrained from making the comment or performed additional investigation. That standard demands that the plaintiff produce "sufficient evidence to permit the conclusion that the defendant in fact entertained serious doubts as to the truth of [the defendant's]

32

publication."[27]  *Id.* (quoting *St. Amant v. Thompson*, 390 U.S. 727, 731 (1968)). Nonetheless, as we highlighted in *Stanalonis*: "Every Maryland attorney takes an oath to act 'fairly and honorably.'"  445 Md. at 149.

Third, as we recently stated in *Attorney Grievance Commission v. Pierre*:

[I]n assessing both whether a statement is false and whether the speaker had knowledge of its falsity or acted with reckless disregard thereof, there is an important distinction between statements of fact and statements of opinion. "Under the First Amendment there is no such thing as a false idea. . . .  But there is no constitutional value in false statements of fact.  Neither the intentional lie nor the careless error materially advances society's interest in 'uninhibited, robust, and wide-open' debate on public issues." *Gertz v. Robert Welch, Inc.*, 418 U.S. 323, 339-40 (1974) (quoting *Sullivan*, 376 U.S. at 270).  Although statements of opinion are generally not subject to being proven false, statements of fact are.  Moreover, statements of opinion, even those widely viewed as erroneous or unfair, are both less likely to mislead and more valuable to protect in the service of free and open public discourse than are false statements of fact. *See id.*  It is therefore false statements of fact that are the subject of MARPC 8.2(a) and analogous provisions in other states. *See, e.g.*, *Matter of Callaghan*, 796 S.E.2d 604, 628 (W. Va. 2017) (finding judicial candidate's materially false statements on campaign flyer impugning opponent were not protected by First Amendment and violated rules of professional conduct); *In re O'Toole*, 24 N.E.3d 1114, 1126 (Ohio 2014) ("Lies do not contribute to a robust political atmosphere, and 'demonstrable falsehoods are not protected by the First Amendment in the same manner as truthful statements.'" (quoting *Brown v. Hartlage*, 456 U.S. 45, 60 (1982)); *In re Chmura*, 608 N.W.2d 31, 33 (Mich. 2000) (finding canon of judicial conduct restricting false or misleading public communications by judicial candidates unconstitutionally overbroad before narrowing it to prohibit only "knowingly or recklessly using forms of public communication that are false").

__ Md. __, 2023 WL 5266218 *1, *14 (2023).

---

[27] As we observed in *Stanalonis*, there is disagreement among the states concerning whether an objective or subjective test should apply in attorney discipline cases.  445 Md. at 143.  As in that case, we need not resolve that disagreement here because it would not be dispositive as to whether Mr. Weinberg violated MARPC 8.2(a).

Finally, when an attorney's statements are made during litigation—either in court or in court filings—we must also take great care to ensure that we do not chill speech or conduct that might legitimately advance the interests of their clients. A similar interest is protected in our defamation jurisprudence, where we afford absolute privilege for in-court statements that bear a rational relationship to the matter before the court. *See Norman v. Borison*, 418 Md. 630, 650, 653–54 (2011). Such statements are protected "even if [the attorney's] purpose or motive was malicious, [the attorney] knew that the statement was false, or [the attorney's] conduct was otherwise unreasonable." *Id.* at 651 (quoting *Adams v. Peck*, 288 Md. 1, 3 (1980)). "We give the privilege a broad and comprehensive interpretation, so as to foster the free and unfettered administration of justice[,]" because the "ultimate purpose of the judicial process is to determine the truth."[28] *Id.* at 651–52 (citations and internal quotation marks omitted).

Unlike a defamation action, "there is no absolute privilege that would protect an attorney from disciplinary action." *Frost*, 437 Md. at 268 n.14. However, the same general purpose underlying the absolute judicial privilege from defamation actions mandates the exercise of great caution in attorney discipline matters to ensure that our enforcement of Rule 8.2(a) does not chill lawyers from engaging in potentially legitimate advocacy. For that reason, statements made in court or in court filings should form the basis for a violation

---

[28] That protection is less "broad and comprehensive" for out-of-court attorney speech extrinsic to judicial proceedings. *See, e.g.*, *Norman*, 418 Md. at 659 (discussing higher threshold for applying absolute privilege to statements made extrinsic to a judicial proceeding).

of Rule 8.2(a) only when they could not conceivably be viewed as part of legitimate advocacy.

Accordingly, we begin our review first with the statements Respondent made at the hearing before Judge Alban, the August 8, 2021, email to Judge Klavans, and the August 2021 flyer.

### i. The August 6, 2021, hearing before Judge Alban

On August 6, 2021, Respondent was representing the defendant in *State v. Harrod*. The hearing judge found that Respondent's statements during that hearing were all made with reckless disregard as to their truth or falsity, impugning the integrity of the judge. Respondent contends that Bar Counsel failed to prove that these statements were made with reckless disregard as to their truth or falsity. As found by the hearing judge, Respondent's statements about Judge Alban were "random statements not based on fact." Indeed, when Bar Counsel asked him to provide details about instances in which Judge Alban lied and was biased, he indicated that breaking her judicial oath made her a liar. In addition, he admits that his claim that Judge Alban was "complicit in kidnapping" related to Ms. Lemons' bond being revoked by Judge Ripken and being returned to detention.[29]

As noted, in-court statements made in the course of representing clients should form the basis for a Rule 8.2(a) violation only when they could not conceivably be viewed as

---

[29] Ms. Lemon's bail was revoked because she violated the terms and conditions of her pretrial release while serving home detention.

part of legitimate advocacy, lest we inadvertently chill legitimate speech or conduct.[30]

Respondent's statements were made in connection with his motion for Judge Alban to recuse herself from presiding over a case involving a client of Respondent (not Ms. Lemons). Because they were made in court in connection with a motion made on behalf of a client, it is appropriate to carefully scrutinize Respondent's statements at the August 6, 2021, hearing.

After Respondent asked Judge Alban to recuse herself, Judge Alban asked him to state the basis for his request. He responded:

> You are a liar, you are biased, you have demonstrated bias, you have stepped into the shoes of the State's Attorney on occasion, you refuse to apply the law when it doesn't suit your purposes or when you don't agree with it. You are complicit in kidnaping and basically you are corrupt for a judge. So I have to ask you that you recuse yourself.

Later in the hearing, Respondent renewed his request for recusal, stating: "You are a liar, you are bias[ed], you step into the shoes of the State's Attorneys, you are corrupt, you are complic[it] in kidnaping, and my client cannot get a fair hearing in front of you."

---

[30] We acknowledge that we have not previously articulated this standard, and that we have found violations of Rule 8.2(a) on at least two occasions based on statements made in court filings in the course of representing clients. *Att'y Grievance Comm'n v. McClain*, 406 Md. 1, 15–16, 18 (2008) (sustaining Rule 8.2(a) violation based on an attorney's assertion in a brief that the judge was motivated by personal bias); *Att'y Grievance Comm'n v. DeMaio*, 379 Md. 571, 585 (2004) (sustaining a Rule 8.2(a) violation by an attorney who, among other things, filed a motion containing "false, spurious and inflammatory representations and allegations with respect to" the Chief Judge and Clerk of the Appellate Court of Maryland). However, it does not appear that the respondents in those cases argued that a different standard should apply or raised a concern about chilling legitimate advocacy.

Because he made very similar statements on two occasions during different parts of the hearing, it is clear that Respondent's comments were neither mistaken nor the product of a surge of unfortunate or regrettable emotion, but instead were considered and intentional. That is also clear from the explanation he provided to the hearing judge, which is, in essence, that his statements were true. He claimed that Judge Alban: (1) is a liar because she broke her oath to uphold the Constitution by ignoring controlling law in at least two cases; (2) is biased because, among other reasons, she ignored governing case law to rule in favor of the State, denied a motion to reinstate without a hearing, reported him to Bar Counsel without reporting his opposing counsel, and spoke negatively of him with other judges; (3) struck his appearance as counsel in *Lemons*; (4) was complicit in kidnapping because Ms. Lemons would not have been taken into custody if Judge Alban had not removed him as counsel; and (5) is corrupt for all those reasons. The hearing judge concluded that those explanations were "random statements that are not based on fact" and, therefore, that Respondent's statements were made with reckless disregard as to their truth or falsity.

Certain of Respondent's statements, if made by themselves, could conceivably be part of legitimate advocacy in connection with a recusal motion, including his contentions of general bias and providing improper assistance to an opposing party. Indeed, if an attorney believes that a judge has demonstrated bias justifying recusal, it will ordinarily be incumbent on the attorney to raise that issue and explain the basis. *See, e.g.*, *In re Dixon*, 994 N.E.2d 1129, 1138 (Ind. 2013) (stating that "[c]ounsel's advocacy on such [recusal for bias] matters must not be chilled by an overly restrictive interpretation of Rule 8.2(a)"). If

37

Respondent had stopped there, we would not be inclined to conclude that he violated Rule 8.2(a), notwithstanding the falsity of the claims.

Here, however, Respondent went further, accusing Judge Alban of being "complicit in kidnaping" and being "corrupt for a judge." As the hearing judge correctly found, those are statements of fact, not opinion; they were false; and, absent any reasonable articulable basis for Respondent to have believed they were true, were made with at least reckless disregard for their truth or falsity. The fervency of Respondent's belief that his former client had been wronged neither justifies nor excuses his false, public accusations of corrupt, criminal behavior by Judge Alban. We cannot discern any conceivable role for such accusations in legitimate advocacy. Thus, Respondent's statements during the August 6, 2021, hearing violated MARPC 8.2(a). *See, e.g.*, *Frost*, 437 Md. at 260–62 (finding Rule 8.2(a) violation where attorney made statements accusing judges of corruption). Moreover, a lawful order of detention is not a crime of kidnapping. The hearing judge, therefore, properly found that these statements were made with reckless disregard as to their truth or falsity and impugned Judge Alban's integrity. Thus, we do not find that the hearing judge's finding is clearly erroneous, and we overrule Respondent's exception as to these statements made by Respondent at the hearing on August 6, 2021.

### ii. The August 8, 2021, email to Administrative Judge Klavans

On August 8, 2021, Respondent sent Judge Klavans the following email, which, in relevant part, stated:

> Pam Alban. While on the bench has lied, acted as a State's attorney, demonstrated bias towards the state, and is complicit in kidnapping. She also refuses to apply the law when it does not suit her personal beliefs[.]

38

> Judge Wachs: H[e] [has] demonstrated bias against the Defense Bar, his hypocrisy, and his refusal to apply the law has caused permanent harm to [ ] some of my clients.
>
> Judge Mulford: His bias against me, his allowing, . . . [the] State's [A]ttorney to lie to the Court, and commit fraud upon the court, all remove him from the ability to be fair and impartial to me or my clients[.]

Respondent requested that the three judges "be permanently recused from any case [he is] named in[.]" The email was sent only to Judge Klavans. The hearing judge concluded that Respondent's statements contained in the email to Judge Klavans, concerning Judges Alban, Wachs, and Mulford, violated Rule 8.2(a).

We disagree with the hearing judge's finding of fact and conclusions of law with respect to the email. Although Respondent's statements in the email were unseemly and intemperate, and many of them were false, the purpose of Rule 8.2(a) is to "protect[] the integrity of the judicial system, and the public's confidence therein," and "not to protect judges[] . . . from unkind or [even] undeserved criticisms." *Frost*, 437 Md. at 263. We fail to see how criticisms made only in a document sent to one administrative judge could potentially have an adverse effect on the integrity of the judicial system or the public's confidence therein. As a result, we find no clear and convincing evidence that any of the statements in Respondent's August 8, 2021, email support the conclusion that he violated Rule 8.2(a). We, therefore, sustain Respondent's exceptions to the hearing judge's conclusion of law that Respondent violated Rule 8.2(a) with respect to the statements in the email.

39

### iii. The August 2021 flyer

The hearing judge found that Respondent also violated Rule 8.2(a) because of the statements he made in the flyer and disseminated to a listserv used by the Maryland Criminal Defense Attorneys' Association. Respondent was aware that other attorneys and judges outside of the listserv also had seen the flyer, as well as the recall petition that was accessible by the QR code. Respondent claims that he was seeking to have Ms. Lemons released and that the judges' actions preventing this should be exposed. The hearing judge also rejected this testimony and concluded that the statements in the flyer were made with "reckless disregard as to [their] truth or falsity, [and] impugned the integrity" of the judges.

Having been circulated that broadly, it was easily foreseeable that the flyer could have been, and perhaps was, distributed to the public (i.e., members outside the legal profession). Moreover, the flyer did not merely accuse the judges targeted in it (Judges Alban and Wachs) of getting the law wrong or even generally being biased. Instead, it directly accused both of them of being "Lawless" and exhibiting "Criminality." Those accusations fall squarely within the type of "false, scandalous or other improper attacks upon a judicial officer" that we have previously held are "subject to discipline" under Rule 8.2(a). *Frost*, 437 Md. at 265 (quoting *In re Evans*, 801 F.2d 703, 707 (4th Cir. 1986)); *see also see Att'y Grievance Comm'n v. McClain*, 406 Md. 1, 15–16, 18 (2008) (finding that attorney violated Rule 8.2(a) when the attorney asserted in a brief that a judge was motivated by personal bias); *Att'y Grievance Comm'n v. DeMaio*, 379 Md. 571, 585 (2004) (finding that attorney violated Rule 8.2(a) when the attorney made "false, spurious and

inflammatory representations and allegations with respect to" the Chief Judge and Clerk of the Appellate Court of Maryland).

On the flyer, Respondent also accused Judge Wachs of refusing to apply the law, refusing to consider evidence, denying a required hearing, and applying the rules unfairly. And he accused Judge Alban of refusing to apply the law when it did not fit the results she wanted, ignoring laws and rules she does not like, and unlawfully depriving a woman of counsel. Although some of those statements, if made on their own, might not rise to the level of supporting an 8.2(a) violation, we must view the statements on the flyer in their totality, including the statements accusing Judges Wachs and Alban of lawless and criminal behavior. After an independent review of the record, we find that the hearing judge's determination is not clearly erroneous. We conclude that the Respondent violated Rule 8.2(a) when he distributed the August 2021 flyer. Thus, we overrule his exception as to the hearing judge's conclusion on this violation.

### 4. Rules 8.4(a), (c), and (d): Respondent Violated Multiple Rules; Engaged in Conduct Involving Dishonesty, Fraud, or Misrepresentation; and Engaged in Conduct Prejudicial to the Administration of Justice

Here, the hearing judge found that Respondent violated Rule 8.4(a) when he "violate[d] any other Rule under the MARPC." *Parris*, 482 Md. at 597 (citations and internal quotation marks omitted). Next, she also found that Respondent violated Rule 8.4(c) by making "false statement[s] knowing that [they were] untrue." Specifically, the hearing judge concluded that the violations of Rule 3.3(a)(1) constitute violations of Rule 8.4(c). That is—the hearing judge found that Respondent's June 18 motion and the Habeas Petition misrepresented what Ms. Hirsch would testify to with respect to whether she could

41

identify Ms. Lemons as the person who assaulted her and robbed the 7-11 store. And finally, the hearing judge concluded that Respondent's statements, including those made directly to Judge Alban, as well as those in the email to Judge Klavans and in the Flyer, violated Rule 8.4(d) because the statements "were neither inartful slips of the tongue nor spoken in the heat of an oral altercation," and that his conduct "tend[ed] to bring the legal profession into disrepute." We agree with most of these findings and conclusions of law by the hearing judge.

First, because we conclude that Respondent violated Rules 3.3(a)(1) and 8.2(a), we also conclude that he violated Rule 8.4(a) by "violat[ing] . . . the Maryland Attorneys' Rules of Professional Conduct[.]" Md. Rule 19-308.4(a); *see also Att'y Grievance Comm'n v. Hoerauf*, 469 Md. 179, 214 (2020) (noting that an attorney violates Rule 8.4(a) when "he or she violates any other Rule under the MARPC").

Second, as to Rule 8.4(c), Respondent made knowing and intentional misrepresentations to the circuit court in his June 18 Motion and Habeas Petition in violation of Rule 3.3(a)(1). Both pleadings contain knowingly false representations of what Ms. Hirsch would testify to regarding her identification of Ms. Lemons as the person who assaulted her and robbed the 7-11. Indeed, the averments do not come close to what Ms. Hirsch had maintained each time she and Respondent communicated about the identity of the perpetrator.

Finally, an attorney violates Rule 8.4(d) if they engage in conduct that "negatively impacts the public's perception of the legal profession." *Basinger*, 441 Md. at 712 (quoting *Att'y Grievance Comm'n v. McDowell*, 439 Md. 26, 39 (2014)). We agree that the August

42

in-court statements to Judge Alban and those statements about Judges Alban and Wachs in the flyer, along with the QR code linking to the recall petition, impugned the judges' character because they were publicly disseminated. By doing so, Respondent negatively impacted the public's perception of the legal profession as contemplated by Rule 8.4(d). With respect to the statements in the August 8 email that Respondent sent to Judge Klavans, however, we do not find that those statements in the email constitute violations of Rule 8.4(d) for the reasons we explained above in Section IV(B)(3)(i). Excluding those statements, Respondent's conduct certainly reflects negatively on the legal profession, impairs public confidence in the legal system, and had the potential to engender disrespect for the courts throughout the State. We conclude, therefore, that this conduct violates Rule 8.4(d) by clear and convincing evidence.

# VI
## AGGRAVATING AND MITIGATING FACTORS

In every attorney discipline case, we consider whether any aggravating and mitigating factors are present. To begin, we briefly review the established aggravating factors:

> (1) prior attorney discipline; (2) a dishonest or selfish motive; (3) a pattern of misconduct; (4) multiple violations of the M[A]RPC; (5) bad faith obstruction of the attorney discipline proceeding by intentionally failing to comply with the Maryland Rules or orders of this Court [ ]; (6) submission of false evidence, false statements, or other deceptive practices during the attorney discipline proceeding; (7) a refusal to acknowledge the misconduct's wrongful nature; (8) the victim's vulnerability; (9) substantial experience in the practice of law; (10) indifference to making restitution or rectifying the misconduct's consequences; (11) illegal conduct, including that involving the use of controlled substances; and (12) likelihood of repetition of the misconduct.

*White*, 480 Md. at 385 (quoting *Att'y Grievance Comm'n v. Keating*, 471 Md. 614, 639 (2020)).  On the opposite end, we consider the following mitigating factors:

> [A]bsence of a prior disciplinary record; absence of a dishonest or selfish motive; personal or emotional problems; timely good faith efforts to make restitution or to rectify consequences of misconduct; full and free disclosure to disciplinary board or cooperative attitude toward proceedings; inexperience in the practice of law; character or reputation; physical or mental disability or impairment; delay in disciplinary proceedings; interim rehabilitation; imposition of other penalties or sanctions; remorse; and finally, remoteness of prior offenses.

*Id.* at 385–86 (quoting *Keating*, 471 Md. at 639–40).  While it is Bar Counsel's obligation to prove each aggravating factor by clear and convincing evidence, the burden for Respondent is less onerous, requiring proof of any mitigating factors only by a preponderance of the evidence.  *Id.* at 386 (citing *Att'y Grievance Comm'n v. Karambelas*, 473 Md. 134, 171 (2021)).

Here, the hearing judge found the following four aggravating factors: a pattern of misconduct; multiple violations of the rules of professional conduct; submission of false evidence, false statements, or other deceptive practices during the attorney disciplinary process; and substantial experience in the practice of law.  The hearing judge also found the following mitigating factors: absence of prior discipline; absence of a dishonest or selfish motive; remorse; and unlikelihood of repetition of the misconduct.

## A.    *Aggravating Factors*

Of the four aggravating factors that the hearing judge found, Respondent argues that Petitioner proved by clear and convincing evidence only that he has substantial experience

44

in the practice of law. As to the others, Respondent excepts to the hearing judge's conclusions.

As we have held above, Respondent violated multiple MARPCs. He did not measure up to the high ethical standards by which all Maryland attorneys are expected to abide. So, we find clear and convincing evidence that Respondent's multiple violations of the rules of professional conduct are aggravating factors. Likewise, we agree there is clear and convincing evidence of a pattern of misconduct. Not only on one, but on two occasions Respondent submitted knowingly false statements to the court about witness testimony: in the June 18 motion and in the Habeas Petition. We also must consider Respondent's statements about Judges Alban and Wachs that were made with reckless disregard as to their truth or falsity. "A pattern of misconduct can be demonstrated 'by multiple violations over time[.]'" *Att'y Grievance Comm'n v. Taniform*, 482 Md. 272, 301 (2022) (quoting *Att'y Grievance Comm'n v. Sperling*, 459 Md. 194, 276 (2018)). Although Respondent argues that he was pursuing justice for Ms. Lemons, the egregious misconduct continued well after Ms. Lemons' case ended. His statements about Judges Alban and Wachs in the flyer were made more than six months after Ms. Lemons pleaded guilty.[31]

"We afford great deference to these determinations 'because it is the trier of fact, and not the appellate court, that possesses a better opportunity to view the evidence

---

[31] Although the hearing judge found that Respondent engaged in sanctionable practices during the attorney disciplinary process and flatly rejected Respondent's testimony that he did not know about the no-contact order prior to July 28, 2020, concluding that his explanations were "inconsistent . . . and evolving[,]" we give no weight to this finding since we have determined that Respondent did not violate Rules 1.1 and 1.2 with respect to that conduct.

presented first-hand, including the demeanor-based evidence of the witnesses, which weighs on their credibility.'" *White*, 480 Md. at 387 (quoting *State v. Manion*, 442 Md. 419 (2015)). Thus, not only because we afford the hearing judge great deference, we also find clear and convincing evidence that the Commission met its burden as to the aggravating factors and overrule Respondent's objections. Respondent engaged in a pattern of misconduct, had multiple violations of the rules of professional conduct, and has substantial experience in the practice of law.

## B. *Mitigating Factors*

For the following reasons, we conclude that Respondent has shown by a preponderance of the evidence the mitigating factors found by the hearing judge.

Respondent has no prior record of attorney discipline. Accordingly, that mitigating factor is established. In addition, throughout his testimony, Respondent showed remorse and showed that what he did was not for dishonest or selfish motives. Respondent consistently expressed that he simply wanted to see his client get the justice he believed that she deserved. Thus, we agree with the hearing judge that Petitioner proved by a preponderance of the evidence the mitigating factors of both absence of a dishonest or selfish motive and remorse.

Similarly, when recounting the statements he made about the three judges, Respondent testified that he would not do it again. Likewise, in the aftermath of the *Lemons* matter, Respondent reflected on his actions, vowing not to let anything of the like happen again. Accordingly, we agree that Respondent has proven by a preponderance of the evidence the mitigating factor of an unlikelihood of repeating this misconduct.

In addition to the four mitigating factors found by the hearing judge, Respondent also asks us to hold that the following mitigating factors apply to him: personal and emotional problems; remedial actions; full and free disclosure to the disciplinary board; and character and reputation. We agree with him as to his remedial actions and cooperation with Bar Counsel but overrule his exceptions as to the others.

First, Respondent claims that during the *Lemons* matter, he and his wife were separated, and he was temporarily living in his office. However, the record does not clearly provide evidence of this as a mitigating factor. Respondent did not present any testimony as to how his separation affected his work, and the timeframe for this testimony seems to fall outside the scope of his representation of Ms. Lemons. Thus, he has not provided mitigation to this extent by a preponderance of the evidence.

Second, as to the character and reputation mitigating factor, we also do not agree that factor is applicable. At the hearing, Respondent failed to present any character witnesses, nor evidence of his good character. He "forgot to ask other attorneys whether they would come and testify on [his] behalf, [regarding his] character [and] reputation in the community." Thus, without any evidence in the record as to Respondent's character, we cannot hold that this mitigating factor applies.

Regarding remedial actions, we agree with Respondent that this factor applies. In her findings, the hearing judge observed that Respondent "credibly testified to the remedial actions he has already taken." Notably, he no longer handles circuit court cases or felonies, and he is currently employed by the St. Mary's County Office of the Public Defender,

handling District Court matters only. Thus, we agree that this mitigating factor has been proven by a preponderance of the evidence.

Finally, we agree with Respondent that he has proven by a preponderance of the evidence his full and free disclosure to Bar Counsel during the disciplinary process. The hearing judge did not make any findings regarding this mitigating factor. Bar Counsel also does not address this factor in its Recommendation for Sanction; rather, it "recognizes the mitigation found by the hearing judge[.]" At the disciplinary hearing, regarding the applicability of various mitigating factors, Respondent testified:

> Full and free disclosure to the disciplinary board or a cooperative attitude towards proceedings. I have been nothing but cooperative. I have in many ways bent over backwards. The detective, he lives in Hartford County. When his attorney notified me that he lived in Hartford County, he had a medical appointment with his son. I immediately told him, I am fine with remote and I'm fine with working around his schedule.
>
> Glenn Neubauer, instead of insisting that he be here today, I said, he can be released as long as I'm able to recall him and it can be remote. I have bent over backwards. (Unintelligible - 4:42:57.) I have done everything to make this easier. I sent everything the bar asked for. I sent to them. Tried to send in somewhat of an, as organized fashion as I could. You've heard no complaints about that.
>
> You've heard nothing about lack of cooperation, or lack of full and free disclosure. At the deposition when asked about the Judge Watts thing, I came forward and, I brought up on my own about my error with the, the habeas just as I did today. I very easily could have just brushed that over and not said a thing. I would never do that though.

(All sic in original).

Respondent's testimony regarding, and exception for, this mitigating factor is well taken. Respondent has put forth sufficient evidence—and Bar Counsel does not

48

challenge[32]—Respondent's cooperative attitude toward Bar Counsel's investigation.  Thus, Respondent has established by a preponderance of the evidence this mitigating factor.

## VII
## THE SANCTION

Bar Counsel recommends that we suspend Respondent indefinitely, but with the right to apply for reinstatement in one year.  Respondent, however, asks that this Court dismiss the charges against him.  We believe the appropriate sanction to impose is an indefinite suspension with the right to apply for reinstatement six months after the beginning of the period of suspension.

The purpose of sanctions in attorney disciplinary proceedings is to "promote both general and specific deterrence and safeguard the public and its confidence in the legal

---

[32] Indeed, when asked by Bar Counsel whether Petitioner would "change anything about [his] communications with [B]ar [C]ounsel in this case; in State v. Lemons[,]" Respondent answered with the following:

> Obviously.  I had sent emails to Ms. Lawless.  I, I sent an email asking her about the flyer, whether it's okay to publish, never heard back.  I wouldn't have done that because I wouldn't have published the flyer, and I should have known not to expect answers.  No, I, I don't remember the details of every email, but *I do remember I was incredibly cooperative*.  When I was sent requests, I either immediately replied or sent the reply that I received this and I will get to it, yada, yada, so I was very attentive to them.
>
> At one point, when I was expecting to be in the mountains for a couple months, I sent an email to Mr. Blow, I believe it was, that I was going to be out of touch for two months, and I wouldn't be able to respond to any emails.
>
> *No, I believe my emails in this case, unless you can -- want to ask me about something specific, were, overall, professional, cooperative, providing all the information, plus more*.  If you want to ask me about something specific, maybe that answer would change if you showed me something that you had in mind.

(Emphases added).  Bar Counsel had no further questions in response.

49

profession." *White*, 480 Md. at 390 (citing *Att'y Grievance Comm'n v. Bonner*, 477 Md. 576, 607 (2022)). It is not to punish attorneys, nor to be retributive. *Id.* (citing *Keating*, 471 Md. at 651). "In determining the appropriate sanction for an attorney, 'we consider the facts and circumstances of each case and order a sanction that is commensurate with the nature and gravity of the violations and the intent with which they were committed.'" *Parris*, 482 Md. at 598–99 (some internal quotation marks omitted) (quoting *Att'y Grievance Comm'n v. Edwards*, 462 Md. 642, 712 (2019)). Included in our review of the facts and circumstances is the evaluation of any mitigating and aggravating factors. *Id.* at 599 (citations omitted).

We first observe that Respondent's actions, in part, are similar to the ones found in *Keating*. In *Keating*, the attorney was vehemently committed to the client, to the point where the attorney's "professional judgement and ethical obligations" became clouded. 471 Md. at 655. The attorney submitted a "will with a knowingly false witness attestation" for probate to the Register of Wills. *Id.* at 636, 656. Accordingly, this Court found that the attorney's knowingly false statements and "criminal and fraudulent" submission of the will violated Rules 8.4(a)–(d). *Id.* at 650.

In violating the Rules, however, we found that the attorney acted "without selfish motivation and took action to try and mitigate" any future problems. *Id.* And based on the circumstances, she was "unlikely" to repeat the misconduct. *Id.* These mitigating factors balanced "with the serious violations of dishonesty before a tribunal" warranted an indefinite suspension, with the right to apply for reinstatement in six months. *Id.* at 654.

Like *Keating*, Respondent committed serious violations with respect to his professional obligations while representing Ms. Lemons. He submitted two documents to the court that contained knowingly false statements. This misconduct occurred because of Respondent's ill-advised actions to prove Ms. Lemons' innocence, although he acted without selfish or dishonest motives in representing Ms. Lemons and even expressed remorse about his actions in zealously doing so.[33]

Unlike *Keating*, however, we recognize that Respondent also engaged in conduct that occurred after the *Lemons* case had concluded. Respondent made multiple statements about two judges with reckless disregard as to their truth or falsity. Moreover, he impugned their character. Respondent acknowledges that these statements were inappropriate, and that he would not, given the opportunity, repeat this conduct. Respondent has taken remedial actions to prevent this type of conduct from happening again by limiting his practice to District Court cases. The conduct that led to these violations occurred after a long legal career during which he has not had any other disciplinary proceedings brought against him.

For all of the reasons above, Respondent's conduct in addition to the relevant aggravating and mitigating factors warrants an indefinite suspension, with the right to apply for reinstatement after six months from the beginning of the period of suspension.

---

[33] In saying this, however, we do not intend to caution against attorneys advocating zealously for their clients. Instead, we merely note that zealous advocacy can, at times, cause unintended consequences. Lawyers should not let their commitment to their client(s) cloud their professional judgment and impinge on their ethical obligations. *See Keating*, 471 Md. at 655.

**IT IS SO ORDERED; RESPONDENT SHALL PAY ALL COSTS AS TAXED BY THE CLERK OF THIS COURT, INCLUDING COSTS OF ALL TRANSCRIPTS, PURSUANT TO MARYLAND RULE 19-709(d), FOR WHICH SUM JUDGMENT IS ENTERED IN FAVOR OF THE ATTORNEY GRIEVANCE COMMISSION AGAINST ASHER NEWTON WEINBERG.**